**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| INFORMED CONSENT ACTION NETWORK,<br><br>Plaintiff,<br>v.<br><br>NATIONAL INSTITUTES OF HEALTH, et al.,<br><br>Defendants. | Civil Action No. 23-cv-03674-RBW<br><br>Consolidated with<br><br>Civil Action No. 24-0813-RBW |

**PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF
MOTION FOR ATTORNEYS' FEES AND COSTS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .......................................................................................................... 1

ARGUMENT .................................................................................................................. 2

    I.   PLAINTIFF IS ELIGIBLE FOR FEES UNDER THE CATALYST THEORY ................. 2

        A.  Plaintiff Has Substantially Prevailed ............................................................. 7

    II.  PLAINTIFF IS ENTITLED TO ATTORNEYS' FEES ...................................................... 10

        A.  Public Benefit ..................................................................................................... 11

        B.  Commercial Benefit to Plaintiff and Nature of Plaintiff's Interest in Records ........... 16

        C.  Reasonableness of Agency's Withholdings .................................................... 17

    III. THE AMOUNT SOUGHT IS REASONABLE ............................................................. 18

CONCLUSION .............................................................................................................. 22

## TABLE OF AUTHORITIES

**Cases**

*Alliance for Responsible CFC Policy, Inc. v. Costle*,
631 F. Supp. 1469 (D.D.C. 1986) ...................................................................... 16

*Brayton v. Office of the U.S. Trade Representative*,
641 F.3d 521 (D.C. Cir. 2011)............................................................................. 2

*Burka v. U.S. Dep't of Health & Human Servs.*,
142 F.3d 1286 (D.C. Cir. 1998) ......................................................................... 3

*Chesapeake Bay Found. v. USDA*,
108 F.3d 375 (D.C. Cir. 1997)...........................................................................11

*Commissioner, I.N.S. v. Jean*,
496 U.S. 154 (1990)........................................................................................... 21

*Cotton v. Heyman*,
63 F.3d 1115 (D.C. Cir. 1995)...............................................................11, 12, 15

*Covington v. Dist. of Columbia*,
57 F.3d 1101 (D.C. Cir. 1995)............................................................................. 2

*Church of Scientology of Cal. v. Harris*,
653 F.2d 584 (D.C. Cir. 1981).................................................................... 3, 11

*Davis v. United States DOJ*,
610 F.3d 750 (D.C. Cir. 2010)............................................................................ 3

*Davy v. CIA*,
550 F.3d 1155 (D.C. Cir. 2008)...........................................................11, 12, 15, 17

*Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*,
218 F. Supp. 3d 27 (D.D.C. 2016) ...................................................................... 9

*Elec. Privacy Info. Ctr. v. DHS*,
811 Supp. 2d 216 (D.D.C. 2011) .................................................................. 15, 16

*Env't Def. Fund, Inc. v. Reilly*,
1 F. 3d 1254 (D.C. Cir. 1993)............................................................................. 19

*Fenster v. Brown*,
617 F.2d 740 (D.C. Cir. 1979) ..................................................................... 16, 17

*Grand Canyon Tr. v. Bernhardt*,
947 F.3d 94 (D.C. Cir. 2020)..................................................................................... 2, 3, 8

*Heard v. District of Columbia*,
2006 U.S. Dist. LEXIS 62912, 2006 WL 2568013, at *19 ...................................................... 21

*LaSalle Extension Univ. v. FTC,*
627 F.2d 481 (D.C. Cir. 1980) ............................................................................................ 11

*McKinley v. Fed. Hous. Fin. Agency*,
739 F. 3d 707 (D.C. Cir. 2014) ........................................................................................10, 11, 17

*Morely v. CIA*,
894 F.3d 389 (D.C. Cir. 2018) ............................................................................................ 17

*Morley v. CIA*,
810 F.3d 841 (D.C. Cir. 2016)............................................................................................. 12

*Nationwide Bldg. Maint., Inc. v. Sampson*,
559 F.2d 704 (D.C. Cir. 1977) ......................................................................................... 2, 21

*Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Veteran Affairs*,
1999 WL 33740260, at *2 (D.D.C. Apr. 13, 1999)............................................................. 21

*Save Our Cumberland Mountains, Inc. v. Hodel*,
857 F.2d 1516 (D.C. Cir. 1988) ......................................................................................... 2

*Sierra Club v. Envtl. Prot. Agency*,
769 F.2d 796 (D.C. Cir. 1985)............................................................................................ 21

*Summers v Dep't of Justice*,
569 F.3d 500 (D.C. Cir. 2009)............................................................................................ 10

*Tax Analysts v. DOJ*,
965 F.2d 1092 (D.C. Cir. 1992)........................................................................................10, 11, 22

*Tax Analysts v. U.S. Dep't of Justice*,
759 F. Supp. 28 (D.D.C. 1991) ........................................................................................... 16

## **Statutes**

5 U.S.C. § 552(a)(4)(E)................................................................................................. 2, 16, 22

5 U.S.C. § 552(a)(4)(E)(ii)............................................................................................. 2, 8

5 U.S.C. § 552(a)(6)(A)(i) ............................................................................................................. 4

**<u>Other Authorities</u>**

Keri N. Althoff et al., *Antibodies to Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) in All of Us Research Program Participants, 2 January to 18 March 2020*, Clinical Infectious Diseases, Feb. 15, 2022 ............................................................ *passim*

Plaintiff Informed Consent Action Network ("**Plaintiff**") respectfully submits this Reply Memorandum in response to Defendants' Opposition to Motion for Attorneys' Fees and in support of its Motion for Attorneys' Fees and Costs against Defendants National Institutes of Health ("**NIH**") and U.S. Department of Health and Human Services ("**HHS**")(collectively "**Defendants**").

## **INTRODUCTION**

Defendants attempt to avoid their statutory obligation to pay attorneys' fees under the Freedom of Information Act ("**FOIA**") by arguing that Plaintiff's litigation had no effect on its processing of the two FOIA requests at issue, and, therefore, is not eligible for fees under the catalyst theory. (Dkt. 24 at 12-13.) But Defendants' argument is belied by both the record and applicable law. Defendants withheld responsive records for more than two and a half years before taking any meaningful steps to fulfill their obligations—then acted swiftly after Plaintiff filed suit. This timeline alone gives rise to a presumption that the litigation catalyzed the release of records.

Next, Defendants argue that Plaintiff has not established that it is entitled to attorneys' fees and costs under FOIA. *Id.* at 19. Specifically, Defendants argue that (1) Plaintiff has failed to articulate what the public benefit was in bringing these suits (*id*. at 20); (2) the record shows that the Plaintiff does not need a public subsidy or an incentive to pursue litigation (*id*. at 23); and (3) the Defendants were reasonable in their withholding of records. *Id*. at 25. However, after properly applying the facts of this case and balancing the factors above, the result is that Plaintiff is entitled to attorneys' fees and costs.

Finally, Defendants argue that even if the Court were to find Plaintiff eligible for and entitled to attorneys' fees, the Court should reduce the amount awarded because Plaintiff's demand is unreasonable. *Id*. In this case, however, Plaintiff met its burden by providing a declaration and

billing records to support its fee request. *See e.g. Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1517 (D.C. Cir. 1988). Once that showing was made, the burden shifted to Defendants to rebut the presumption of reasonableness with specific evidence. *Covington v. Dist. of Columbia*, 57 F.3d 1101, 1107-1109 (D.C. Cir. 1995). Defendants have failed to produce evidence, much less specific evidence, rebutting the presumption of the reasonableness of Plaintiff's attorney fee demand. To be sure, in determining fee awards, courts must keep in mind the purpose behind FOIA: to "encourage the maximum feasible public access to government information" and to "facilitate citizen access to the courts to vindicate their statutory rights." *Nationwide Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 715 (D.C. Cir. 1977). As a result, the "touchstone of a court's discretionary decision" is whether an award is necessary to advance the goals underlying FOIA. *Id.*

## **ARGUMENT**

## I.      **PLAINTIFF IS ELIGIBLE FOR FEES UNDER THE CATALYST THEORY**

Under D.C. Circuit precedent, the first step in the analysis of a claim for attorneys' fees and litigation costs is to determine whether Plaintiff is "eligible" for an award under 5 U.S.C. § 552(a)(4)(E)(ii). *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011)*.* A plaintiff is eligible if it has "substantially prevailed," meaning that it "obtained relief" through *either*: "(I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the [plaintiff]'s claim is not insubstantial." *Grand Canyon Tr. v. Bernhardt*, 947 F.3d 94, 95 (D.C. Cir. 2020) (quoting 5 U.S.C. § 552(a)(4)(E). This provision authorizes a fee award even in the absence of judicial relief, so long as the agency voluntarily produces records after litigation is filed and the plaintiff's claim is not

meritless. This basis for prevailing is often referred to as the "catalyst theory." *Davis v. United States DOJ*, 610 F.3d 750, 752 (D.C. Cir. 2010).

Under the catalyst theory, the question is whether the "institution and prosecution of the litigation caused the agency to release the documents obtained." *Grand Canyon Tr.,* 947 F.3d at 97 (emphasis added). Put another way, the plaintiff must show "that it is more probable than not that the government would not have performed the desired act absent the lawsuit." *Id.; accord Davis,* 610 F.3d at 752. ("FOIA plaintiffs [are] eligible for a fee award if the lawsuit substantially caused the agency to release the requested records."); *Burka v. U.S. Dep't of Health & Human Servs.*, 142 F.3d 1286, 1288 (D.C. Cir. 1998) (holding that party claiming attorneys' fees "must first establish eligibility by showing that the lawsuit was reasonably necessary and the litigation substantially caused the requested records to be released"); *Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 587 (D.C. Cir. 1981) (holding that whether a party "substantially prevailed" is "largely a question of causation," asking "did the institution and prosecution of the litigation *cause* the agency to release the documents obtained during the pendency of the litigation?") (emphasis added).

There is no question that Plaintiff's institution and prosecution of litigation caused Defendants to release the documents obtained, and it is more probable than not that the government would not have performed the desired act absent the lawsuit.

\* \* \*

In Defendants' supporting Declaration of Gorka Garcia-Malene, they state:

> In accordance with the law, NIH pays attorney's fees and costs in FOIA matters where plaintiff substantially prevailed and is entitled to fees. NIH does not litigate fees for the sake of doing so. But the Department also will not, as a steward of the public fisc, pay even a nuisance amount to resolve a claim for fees that is as infirm as this one is. To do otherwise could simply encourage plaintiffs to bring

3

unnecessary litigation, thereby burdening the courts and counsel. Moreover, paying fees in a case like this one could induce plaintiffs to make unreasonable demands for fees, which, when paid, deplete agency resources, redirect agency funds towards litigation, and prevent such funds from being spent to fulfill the agency's core duties.

(Dkt. 24-1 ¶ 44)(Garcia-Malene Decl.)

As this reply will illustrate, based on the facts and procedural history of the two cases at issue as agreed to by Defendants and set out in the declaration of Gorka Garcia-Malene, Plaintiff's eligibility for and entitlement to attorneys' fees is neither a "nuisance" demand nor "infirm." At the outset it should be noted that one of the agency's core duties in terms of FOIA requests is to timely respond to FOIA requests within twenty days. Specifically, FOIA mandates that an agency must make a determination regarding a request within twenty business days. 5 U.S.C. § 552(a)(6)(A)(i). NIH did not provide any records — or even complete basic processing tasks — for nearly three years after Plaintiff's requests were submitted. Such extensive delay, coupled with post-suit production, gives rise to a strong inference that the lawsuits caused the agency to act.

Let us look at the facts and procedural history of the two cases at issue. First, as concerns Civil Action *ICAN v. NIH*, Civ. A. No. 23-3674 (RBW), Plaintiff sent its FOIA request on June 17, 2021, seeking "copies of all emails exchanged between Keri N. Althoff and David Schlueter dated between June 15, 2020, and June 15, 2021, regarding the article titled *Antibodies to Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) in All Of Us Research Program Participants, 2 January to 18 March 2020.*" (Dkt. 24-1 ¶ 23). Although NIH acknowledged Plaintiff's FOIA request and assigned it reference number 56560 on June 17, 2021, it was not until May 26, 2022, over eleven months later, that it notified Plaintiff that its request was being referred from NIH to the National Human Genome Research Institute within NIH. *Id*. ¶¶ 24-25. It was also on this date, May 26, 2022, some eleven months after Plaintiff submitted its FOIA request, that NIH first sent

4

a request to the Center for Information Technology to conduct a search of David Schleuter's account for all emails with Keri N. Althoff for the time period of June 15, 2020, through June 15, 2021, containing the search terms requested by Plaintiff. *Id*. ¶ 26. Next, it was not until August 10, 2022, fourteen months after Plaintiff submitted its FOIA request, that NIH even provided Plaintiff with an estimated date of completion of September 21, 2022, and then it did so only at the prompting of Plaintiff. *Id*. ¶ 27. In this case, Plaintiff waited until December 10, 2023, two and a half years after it submitted its FOIA request, to file suit. *Id*. ¶ 29. Importantly, it was not until after Plaintiff filed suit and the parties consolidated *ICAN v. NIH*, Civ. A. No. 23-3674 (RBW) with *ICAN v. NIH*, Civ. A. No. 24-0813 (RBW) on May 24, 2024, nearly three years after Plaintiff submitted its FOIA request, that NIH conducted a responsiveness review and de-duplicated the records at issue. *Id*. ¶¶ 38-39. Finally, it was not until October 1, 2024, that NIH completed processing its first interim release of records and not until November 1, 2024, that NIH completed processing its second interim release of records, essentially taking three years and five months for Plaintiff to receive the records it originally requested on June 17, 2021. *Id*. ¶ 39. Incredibly, however, Defendants attempt to twist the timeline of events by bragging that it only took nine months and twenty-one days from the date when Plaintiff filed a Complaint in *ICAN v. NIH*, Civ. A. No. 23-3674 (RBW) to issue its first interim release and ten months and twenty-two days to issue its second interim release. *Id*. ¶ 40.

Next, let us look at Civil Action *ICAN v. NIH*, Civ. A. No. 24-0813 (RBW). Here, Plaintiff sent its FOIA request on June 17, 2021, seeking "all emails exchanged between Keri N. Althoff, Kelly A. Gebo, and Sheri D. Schully dated between June 15, 2020 and June 15, 2021 regarding the article titled *Antibodies to Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) in All Of Us Research Program Participants, 2 January to 18 March 2020*, available at

https://academic.oup.com/cid/article/74/4/584/6294073?login=false#google_vignette." *Id.* ¶ 32. Although NIH acknowledged Plaintiff's FOIA request and assigned it reference number 56559 on June 17, 2021, it was not until March 14, 2022, over nine months later, that it sent a request to the office of the All of Us Research Program for a search of Dr. Schully's emails between June 15, 2020, and June 15, 2021, regarding the article titled, "*Antibodies to Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) in All Of Us Research Program Participants, 2 January to 18 March 2020.*" *Id.* ¶ 34. It was not until early October 2022, one year and four months after Plaintiff made its initial FOIA request, that the program office conducted a search and provided records to the NIH FOIA office, at which time the NIH FOIA office began reviewing the records. *Id.* ¶ 34. Not until December 2022, some eighteen months after Plaintiff submitted its FOIA request, did the NIH FOIA office and NHLBI FOIA office discuss whether the two requests were duplicates. *Id.* ¶ 35. After not hearing anything from Defendants in nearly three years, Plaintiff filed suit on March 20, 2024. *Id.* ¶ 37. It was not until after Plaintiff filed suit and the parties consolidated *ICAN v. NIH*, Civ. A. No. 23-3674 (RBW) with *ICAN v. NIH*, Civ. A. No. 24-0813 (RBW) on May 24, 2024, nearly three years after Plaintiff submitted its FOIA request, that NIH conducted a responsiveness review and de-duplicated the records at issue. *Id.* ¶¶ 38-39. As previously stated, it was not until October 1, 2024, that NIH completed processing its first interim release of records and not until November 1, 2024, that NIH completed processing its second interim release of records, essentially taking Plaintiff three years and five months to receive the records it originally requested on June 17, 2021. *Id.* ¶ 39. Again, Defendants attempt to twist the timeline of events, bragging that it only took six months and eleven days from the date when Plaintiff filed a Complaint in *ICAN v. NIH*, Civ. A. No. 24-0813 (RBW) to issue its first interim release and seven months and twelve days to issue its second interim release. *Id.* ¶ 40.

6

Although it took Plaintiff three years and five months to receive the records originally requested, Defendants would have this Court believe that Plaintiff's lawsuit neither accelerated nor altered NIH's response to Plaintiff's request. *Id*. ¶ 41. This argument ignores the factual and procedural history of the cases at issue as set forth above. To be sure, NIH failed to provide timely acknowledgment of referrals, initiate searches for nearly a year, or communicate or produce records for over two years. Likewise, NIH had missed its FOIA deadline prior to the lawsuit, made no meaningful progress before suit was filed, and only began production efforts in earnest after the litigation began. These inexcusable delays and factual record create a strong inference that only the lawsuit prompted compliance.

### A.     Plaintiff Has Substantially Prevailed

The relevant inquiry here is not the speed with which the agency produced records after suit was filed, but whether Plaintiff's lawsuit was a substantial factor in eventually compelling disclosure that had not occurred voluntarily. Make no mistake, voluntary compliance was not forthcoming. The agency's own behavior shows it was not prioritizing the request until legally compelled to do so. Without the litigation, production could have taken even longer or never truly occurred. If anything, the agency's extended delay following the filing of these lawsuits only confirms that litigation was essential. Absent the court's jurisdiction and Plaintiff's persistence, there is no reason to believe the agency would have produced the records at all. It would be entirely unfair in this case for the government to escape attorneys' fees by dragging its feet for years and then claiming the lawsuit had no effect. The agency's delay after suit was filed does not prove litigation was ineffective – it proves it was necessary. The statute does not reward agencies for dragging their feet; it rewards requesters who use litigation to enforce their rights.

FOIA provides that a plaintiff has "substantially prevailed" if it obtains relief through "a voluntary or unilateral change in position by the agency" and the claim is not insubstantial. 5 U.S.C. § 552(a)(4)(E)(ii). The D.C. Circuit and other courts routinely find that plaintiffs substantially prevail when their lawsuits act as a catalyst for the release of information. Indeed, a plaintiff substantially prevails when he obtains relief through a voluntary change in the position of the agency if the lawsuit causes the agency to release the requested documents. *Grand Canyon Tr.,* 947 F.3d at 97. NIH's argument that Plaintiff's lawsuits did not influence when the records were released misses the point. FOIA fee-shifting does not require proof that litigation changed the substance of the records – only that the agency's timing or position changed as a result of the litigation. Here, the agency produced records only after Plaintiff sued, despite sitting on the request for over two years.

The fact of the matter is that the agency failed to produce a single record for more than three years after the requests were submitted. It was only after Plaintiff filed its lawsuits in December 2023 and March 2024 that NIH began its responsiveness review, conducted de-duplication, and issued two rolling productions in October and November 2024. This dramatic shift in conduct, occurring shortly after litigation was initiated, is sufficient to meet the substantial prevailing standard. Moreover, the record makes clear that NIH did not conduct any meaningful review or processing of Plaintiff's FOIA requests until after litigation was commenced. In both FOIA requests NIH delayed conducting searches for up to eleven months, failed to conduct a responsiveness review for nearly three years, and never provided any production until after the lawsuits were filed and the two cases consolidated.

The fact that NIH issued both its first and second interim productions within months of Plaintiff's lawsuits demonstrates that the litigation triggered a material change in the agency's

8

conduct. This is precisely the type of post-litigation change in agency position that qualifies a plaintiff as a prevailing party. *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.,* 218 F. Supp. 3d 27, 41 (D.D.C. 2016) ("an agency's sudden acceleration in processing a FOIA request [after a complaint is filed] may lead to the conclusion that the lawsuit substantially caused the agency's compliance with FOIA.") Defendants argue, however, that because the agency did not release the records until six months after these lawsuits were filed, the litigation could not have caused production. But this misstates the legal standard. FOIA does not require immediate or total compliance following a complaint; it requires only that the lawsuit be a substantial cause of the agency's change in position. That the agency produced no records prior to suit and then took six months or more after being sued to comply only underscores that litigation was necessary. Defendants' argument, if accepted, would perversely reward agencies for stonewalling requesters even after suit is filed – a result Congress explicitly rejected when it codified the catalyst theory in 2007.

Moreover, NIH's assertion that it would have released the records regardless of litigation is unavailing. In essence, Defendants hope to avoid their statutory obligation to pay attorneys' fees by stating they were "going to comply anyway." However, NIH had more than three years to release the records voluntarily and failed to do so. Only after Plaintiff filed suit did the agency begin processing and production. NIH's self-serving assertion that it would have released the records anyway is unsupported and contrary to the facts and procedural history of these cases. Specifically, between June 2021 and December 2023/March 2024 no records were produced. Within months of litigation, NIH completed responsiveness reviews and released records. NIH itself tracks production timelines starting from the date of the Complaint, not from the original FOIA request. This undermines NIH's "we would have done it anyway" defense. For instance,

9

NIH's defense — that it produced records within "9 months and 21 days" (in Case No. 23-3674) and "6 months and 11 days" (in Case No. 24-0813) after Plaintiff filed suit — undermines its position. These timelines start counting from the date of the Complaint, not from the date of the original FOIA requests. That NIH relies on these post-suit benchmarks to frame its production speed is itself a tacit admission that the lawsuit influenced its actions.

In short, the facts and procedural history paint a clear picture of extended agency delay, lack of responsiveness, and significant action only after litigation began, all of which are crucial for establishing that Plaintiff substantially prevailed under FOIA and is entitled to attorneys' fees and costs. Moreover, Plaintiff's claim was not insubstantial. Plaintiff had a credible basis for challenging Defendants' delay and withholding of records, and the lawsuits were required to compel timeliness. Finally, Defendants' argument amounts to saying that because it eventually intended to comply with FOIA, litigation had no effect. But that logic would effectively immunize agencies from fee liability in all delayed production cases – a result squarely rejected by the FOIA statute. Indeed, litigation need only be a substantial cause of disclosure, not the exclusive one.

## II.     PLAINTIFF IS ENTITLED TO ATTORNEYS' FEES

Courts are to consider at least four criteria in determining whether a substantially prevailing FOIA litigant is entitled to attorneys' fees: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents." *McKinley v. Fed. Hous. Fin. Agency*, 739 F.3d 707, 711 (D.C. Cir. 2014) (quoting *Tax Analysts v. DOJ*, 965 F.2d 1092, 1093 (D.C. Cir. 1992), superseded by statute as recognized in *Summers v Dep't of Justice*, 569 F.3d 500 (D.C. Cir. 2009). "[T]he first three factors assist a court in distinguishing between requesters who seek documents for public informational purposes and those who seek documents

for private advantage." *Davy v. CIA*, 550 F.3d 1155, 1160 (D.C. Cir. 2008) ("*Davy II*"). The fourth factor, in contrast, considers whether the agency's position "had a reasonable basis in law," *Tax Analysts*, 965 F.2d at 1096, and asks whether the agency was "recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior." *McKinley*, 739 F.3d at 712 (internal quotation marks omitted). The second and third factors—the commercial benefit to the plaintiff and the nature of the plaintiff's interests in the records requested— "are closely related and often considered together." *Tax Analysts*, 965 F.2d at 1095.

No single factor is dispositive of the FOIA fee-entitlement inquiry, and courts consider the factors in light of the "twin congressional goals" of the FOIA fee-shifting provision. *See LaSalle Extension Univ. v. FTC*, 627 F.2d 481, 484 (D.C. Cir. 1980). The first goal is "to encourage [FOIA] suits that benefit the public interest." *See id.* The second goal is to provide compensation to a successful litigant "for enduring an agency's unreasonable obduracy in refusing to comply with [FOIA's] requirements." *Id.* None of the four entitlement factors "is dispositive." *Davy II*, 550 F.3d at 1159. "The sifting of those criteria over the facts of a case is a matter of district court discretion." *Tax Analysts*, 965 F.2d at 1094 (citing *Church of Scientology*, 653 F.2d at 590).

### A.    Public Benefit

The first factor assesses "the public benefit derived from the case," *Tax Analysts*, 965 F.2d at 1093, and requires consideration of both the effect of the litigation for which fees are requested and the potential public value of the information sought. S*ee Chesapeake Bay Found. v. USDA*, 108 F.3d 375, 377 (D.C. Cir. 1997); *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995); *Tax Analysts*, 965 F.2d at 1093-94. To assess the public benefit derived from the case, a court must determine whether the lawsuit "is likely to add to the fund of information that citizens may use in

11

making vital political choices." *Davy II*, 550 F.3d at 1164 (Tatel, J., concurring) (quoting *Cotton,* 63 F.3d at 1120 (internal quotation marks omitted)).

*Davy* required the court to assess "the potential public value of the information sought," *Davy II*, 550 F.3d at 1159 (citations omitted), not the public value of the information received. In *Morley v. CIA*, 810 F.3d 841, 844 (D.C. Cir. 2016), the D.C. Circuit clarified, "[l]est there be any uncertainty," that "the public-benefit factor requires an *ex ante* assessment of the potential public value of the information requested, with little or no regard to whether any documents supplied prove to advance the public interest . . . . [I]f it's plausible *ex ante* that a request has a decent chance of yielding a public benefit, the public-benefit analysis ends there." Thus, the question is whether there was "a decent chance" that Plaintiff's request would "generat[e] useful new information about a matter of public concern." *Id.*

Here, Defendants argue that Plaintiff has failed to sufficiently articulate what the public benefit was in bringing these suits. (Dkt. 24 at 20.) After quoting several of Plaintiff's well-founded reasons for seeking disclosure of the records at issue (*id.*), Defendants conclude that the purported public interest that Plaintiff advances is weak, if not non-existent. *Id.* at 21. To support their argument that Plaintiff's stated public benefit is weak or non-existent, all Defendants can say is that (1) the "article itself is a consummation of the deliberations of the authors before publishing . . . .; (2) the article presents a conclusion, which Plaintiff does not appear to challenge . . . .; and (3) the public interest is in the article itself. *Id.* Frankly, Defendants' attempts to persuade this Court that Plaintiff lacked a public interest in the records sought is mere word salad which makes no sense when compared to stated public purposes set forth by Plaintiff, which although set forth in its Motion for Attorneys' Fees and Costs, evidently bears repeating in this Reply memorandum.

12

Keri N. Althoff, David Schlueter, Kelly A. Gebo, and Sheri D. Schully were four of twenty-two authors of the article titled "*Antibodies to Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) in All Of Us Research Program Participants, 2 January to 18 March 2020.*"[1] At a time of limited testing capacity in the United States, testing focused on symptomatic patients with travel histories—limiting early visibility of community transmission. The article sought to identify individuals with SARS-CoV-2 antibodies in the early weeks of the U.S. epidemic and concluded that SARS-CoV-2 infections occurred weeks before the first recognized cases in five U.S. states. Plaintiff reasonably believed that internal email correspondence from June 15, 2020, to June 15, 2021, would shed light on the development and timing of the publication, including scientific deliberations relevant to early virus spread.

This article reported serological evidence of SARS-CoV-2 antibodies in blood samples collected from participants in the NIH's All of Us Research Program significantly before the first officially confirmed cases in several U.S. states. These findings raised critical questions about the federal government's understanding of the virus's entry into the United States and whether key information about early community transmission was delayed or suppressed.

The requested emails were reasonably believed to contain critical context regarding:

- The internal scientific deliberations about the validity and interpretation of the early seropositive findings;

- The timing and potential delay in publication of the study results, relative to when the data were first known or understood by the researchers;

- Communications with federal or institutional actors concerning the study's conclusions, public messaging, or press strategy; and

---

[1] https://academic.oup.com/cid/article/74/4/584/6294073?login=false#google_vignette, last checked July 18, 2025.

13

- Any reservations, limitations, or external influences discussed privately that may not have been fully reflected in the final published article.

Given the extraordinary public interest in the early timeline of COVID-19, including multiple congressional inquiries, media investigations, and academic debates, these communications bore directly on questions of scientific transparency, potential government suppression or delay of material public health information, and the integrity of federally funded research conducted during a national emergency.

As such, Plaintiff's interest in obtaining this material was not speculative or academic, but instead directly served the core purposes of the Freedom of Information Act: to inform the public about government activities and ensure accountability where scientific findings may intersect with public policy or national crisis response. The disclosure of these records could have materially contributed to the public's understanding of how early COVID-19 findings were handled and communicated within federally affiliated institutions. Therefore, the emails sought in these requests are directly tied to Plaintiff's effort to shed light on an issue of exceptional national importance, justifying an award of attorneys' fees under FOIA's public benefit standard.

Similarly, the emails exchanged between Dr. Keri Althoff and Mr. David Schlueter from June 15, 2020, to June 15, 2021, were thought to be of direct and substantial public interest because they pertain to the development, internal evaluation, and dissemination of a significant scientific study funded by the federal government. That study—" *Antibodies to Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) in All Of Us Research Program Participants, 2 January to 18 March 2020*"—was ultimately published in *Clinical Infectious Diseases* in 2022 and reported evidence that SARS-CoV-2 was circulating in the United States prior to officially documented cases. Moreover, given the national and international significance of understanding when and how

14

COVID-19 first emerged in the United States, Plaintiff sought emails between key study personnel to shed light on: (1) the timing and internal interpretation of early antibody findings; (2) the reasons for the delay between data generation and publication; (3) potential external influences on publication or communication strategy; and (4) any discrepancies between private correspondence and the public presentation of the study's findings.

These issues go to the heart of public understanding of government health research and crisis response and are thus of the type FOIA was designed to illuminate. *See Davy II*, 550 F.3d at 1159 (the public benefit factor favors fee awards where the information contributes meaningfully to public understanding of government operations or activities). The D.C. Circuit has long held that the "public benefit" factor weighs heavily in favor of a fees award where disclosure is "likely to add to the fund of information that citizens may use in making vital political choices." *Cotton*, 63 F.3d at 1120.

Here, the requested records concern not only a federally funded epidemiological study but also potentially sensitive internal deliberations during a period of national emergency, thereby serving a core FOIA purpose. See *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 234 (D.D.C. 2011) (granting fees where FOIA request is "likely to add to the fund of information that citizens may use in making political choices").

Plaintiff's pursuit of these records was not speculative or private in nature but was a good-faith effort to inform the public about the federal government's early response to the COVID-19 pandemic, the timeline of critical public health findings, and the integrity of scientific communications during a time of crisis. The public benefit resulting from this FOIA request strongly supports an award of attorneys' fees under 5 U.S.C. § 552(a)(4)(E).

15

For the reasons set forth above, the first factor weighs heavily in favor of Plaintiff and Defendants' opposition thereto is wholly without merit.

**B.      Commercial Benefit to Plaintiff and Nature of Plaintiff's Interest in Records**

The second and third factors of the Court's analysis in determining whether a litigant is entitled to attorneys' fees consider the commercial benefit to the complainant and the nature of the complainant's interest in the record sought. *Fenster v. Brown*, 617 F.2d 740, 743 (D.C. Cir. 1979).

In this case, Plaintiff is a non-profit organization that does not commercially benefit from obtaining the records in question. *See Elec. Privacy Info. Ctr. v. DHS*, 811 Supp. 2d 216, 235 (D.D.C. 2011) (explaining that "[f]ee recovery is often appropriate [] when the plaintiff is a nonprofit public interest group"); *Alliance for Responsible CFC Policy, Inc. v. Costle*, 631 F. Supp. 1469, 1471 (D.D.C. 1986) (citing S.Rep. No. 854, 93rd Cong., 2d Sess. 19 (1974)). Additionally, "FOIA suits which are motivated by scholarly, journalistic, or public interest concerns are the proper recipients of fee awards." *See Tax Analysts v. U.S. Dep't of Justice*, 759 F. Supp. 28, 30 (D.D.C. 1991), *aff'd*, 965 F.2d 1092, 296 U.S. App. D.C. 130 (1992).

Here, Defendants argue that these two factors barely favor Plaintiff's position because Plaintiff does not need a public subsidy or an incentive to pursue litigation. (Dkt. 24 at 23.) Defendants support their argument by complaining about the number of FOIA cases Plaintiff has filed and about the amount of money Plaintiff – a 501(c)(3) – has received in donations over the past several years. *Id*. at 23-24. However, Plaintiff need not spill a lot of ink in response to Defendants' argument. This is because the number of FOIA lawsuits filed, or the amount of donations the non-profit Plaintiff received, has absolutely nothing to do with Plaintiff's entitlement to attorneys' fees. The sole issue before this Court is whether Plaintiff is eligible for and entitled to attorneys' fees. The number of FOIA cases filed and the amount of donations to Plaintiff does

16

nothing to address whether Plaintiff derived a commercial benefit from the FOIA request at issue or the nature of Plaintiff's interest in the records sought. *Fenster,* 617 F.2d 740 at 743. In essence, this argument is completely irrelevant as it relates to Plaintiff's entitlement of attorneys' fees. However, even if one considers it, the number of FOIA suits filed by Plaintiff only serves to substantiate its mission, which is to raise public awareness about vaccine safety and to provide the public with information to give informed consent. (Dkt. 23-1 at 10.)

### C.    Reasonableness of Agency's Withholdings

The fourth factor the Court is to consider is "*why* the agency initially withheld the records." *Morely v. CIA*, 894 F.3d 389, 392 (D.C. Cir. 2018). It requires the Court to evaluate whether the agency "had a reasonable basis in law" for opposing disclosure and whether the agency was "recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior." *McKinley v. Fed. Hous. Fin. Agency*, 739 F. 3d 707, 712 (D.C. Cir. 2014). "The question is not whether [plaintiff] has affirmatively shown that the agency was unreasonable, but rather whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until [plaintiff] filed suit." *Davy v. CIA*, 550 F.3d 1155, 1163 (D.C. Cir. 2008). While the first three factors incentivize FOIA requesters to pursue related litigation that is in the public's interest, the fourth factor "incentiviz[es] the government to promptly turn over – before litigation is required – any documents that it ought not withhold." *Id*. at 1166 (Tatel, J. concurring). Importantly, the agency bears the burden of showing "that it had [a] colorable or reasonable basis for not disclosing the material" at issue. *Id*. at 1163.

In this case, Defendants argue they were reasonable in withholding the records at issue for years because (1) NIH processes all requests as efficiently as possible in the wake of a surge in requests; (2) based on the Declaration of Garcia-Malene generally; and (3) by incorporating

17

Argument Section II of Defendants' Response. (Dkt. 24 at 25.) This is a classic defense raised by agencies in FOIA fee disputes: *"We were going to produce the records anyway, and we were just delayed because of resource constraints."*

The agency's argument that it was overwhelmed by FOIA requests or understaffed is not relevant to the core legal question under this factor: Did the agency have a reasonable legal basis for withholding records prior to litigation? The focus here is not on how efficient the agency was, but whether the withholding or delay was legally defensible. Mere administrative delay does not necessarily equal a reasonable legal basis. FOIA's attorneys' fees provision focuses on whether the agency had a legally justified basis for withholding the requested records—not whether it had practical difficulties in processing them. Moreover, Defendants' assertion that it would have released the records regardless of this litigation is undermined by the timing of the release, which occurred only after Plaintiff filed suit. This strongly suggests that the lawsuit was the necessary catalyst for production, and that the prior withholding or delay was not legally reasonable. In short, Defendants' affidavit may explain the delay, but it does not excuse it. While the agency may have faced genuine operational challenges, it has failed to demonstrate that it had a reasonable legal basis for withholding the records prior to litigation. The agency had a legal obligation to respond within the time required by FOIA, and it failed to do so. That failure—regardless of workload—was not legally reasonable. This factor weighs in favor of a fee award.

## III.    THE AMOUNT SOUGHT IS REASONABLE

Defendants argue that even if this Court were to make an award of attorneys' fees, it should still reduce the amount awarded because Plaintiff's demand is unreasonable. (Dkt. 24 at 25.) Specifically, Defendants argue that Plaintiff's request for attorneys' fees is unreasonable because counsel spent more time preparing the motion for attorneys' fees than litigating the merits of the

18

underlying FOIA cases. *Id*. at 26. Defendants claim that Plaintiff spent 23.8 hours on the underlying litigation and 35 hours preparing the fee motion—approximately sixty-four percent of the total time billed (*id*. at 26-27), and that awarding fees under such a scenario would constitute an "unsupportable windfall." *Id.* at 27. Defendants even go so far as to insinuate that Plaintiff artificially inflated its fee, claiming that, "overbilling the government [is] a serious transgression, damaging to the public fisc and violative of the trust reposed in each member of the bar." *Id*. at 27 (citing *Env't Def. Fund, Inc. v. Reilly*, 1 F. 3d 1254, 1260 (D.C. Cir. 1993). Defendants' arguments misstate the law, mischaracterize the nature of FOIA litigation, and ignore the well-established principle that time reasonably spent seeking fees is compensable. It should be noted, however, that Defendants do not dispute Plaintiff's use of the Fitzpatrick Matrix as a means for determining a reasonable hourly rate.

In response to Defendants' argument regarding the number of hours spent drafting Plaintiff's forty-two-page memorandum which contains seventy-nine legal citations accompanied by a seven-page declaration, Plaintiff stands by the number of hours expended on its Motion for Attorneys' Fees and Costs as attested to by the declaration of Plaintiff's counsel. *See* Dkt. 23-2. Make no mistake, Plaintiff submitted accurate, honest, contemporaneous, and detailed billing records showing dates, times, and the nature of the activities performed. Indeed, Plaintiff is willing to wager that Defendants expended somewhere in the range of 30+/- hours drafting their twenty-three-page response with seven attachments. Accordingly, unless Defendants have some knowledge or evidence, or can otherwise articulate why it feels that Plaintiff expended anything less than 35 hours preparing its Motion for Attorneys' Fees and Costs, its argument is wholly without merit. Moreover, the 35 hours spent on the fee motion were not excessive in light of the fact that the motion involved two consolidated FOIA cases, requiring coordination of records,

procedural histories, and relief obtained. Similarly, Plaintiff anticipated — correctly — that Defendants would vigorously contest eligibility, entitlement, and reasonableness, as it now has. Finally, Plaintiff's petition includes detailed billing records, case-specific application of prevailing market rates, legal analysis under FOIA's evolving fee-shifting standards, and justification of the public benefit and litigation catalyst theory.

In response to Defendants' argument that Plaintiff's fees on it Motion for Attorneys' Fees and Costs are proportionately higher than its fees for the merits of the cases, there is no argument: the hours spent on the matters are what they are. However, Defendants' theory that Plaintiff is seeking a windfall lacks support. The fee-shifting provision in FOIA is designed not to penalize plaintiffs for achieving early or efficient resolution of the merits. Plaintiff's counsel worked efficiently on the underlying matters and only prepared a detailed and thorough fee motion because Defendants' position and the legal standards demanded it. Defendants' characterization of this work as a "windfall" ignores the actual effort required and the legal standards courts apply.

The record reflects Plaintiff's total attorneys' fees and costs expended on its Motion for Attorneys' Fees and Costs total $31,220.00, which Plaintiff voluntarily reduced by ten percent. Thus, the total amount of fees being sought on just Plaintiff's Motion is $28,098.00 (or $14,049 per case), again for a forty-two-page memorandum which contains seventy-nine legal citations accompanied by a seven-page declaration. The opposite of Defendants' argument is true in this unique case, wherein the fees associated with the merits of the case are lower. In such a situation, avoiding any "windfall" to Plaintiff by reducing or refusing to award fees would result in a windfall for Defendants. Moreover, such a tactic would encourage agencies to unreasonably refuse to pay attorneys' fees and costs where the amount sought in the underlying action is low. This is because they would have full knowledge that briefing such an issue is tremendously time consuming and

20

expensive, and fees for doing so would, therefore, eclipse fees on the underlying merits. To avoid situations such as these, the Court should award fees in instances such as the present one to avoid similar tactics, to encourage the maximum feasible public access to government information, and to facilitate citizen access to the courts to vindicate their statutory rights. *See Nationwide Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 715 (D.C. Cir. 1977).

Indeed, a fee application is compensable so long as it is not unreasonably excessive. In *Commissioner, I.N.S. v. Jean*, 496 U.S. 154, 161 (1990), the Supreme Court held that "absent unreasonably dilatory conduct by the prevailing party in 'any portion' of the litigation, which would justify denying fees for that portion, a fee award presumptively encompasses all aspects of the civil action." *See Sierra Club v. Envtl. Prot. Agency*, 769 F.2d 796, 808 (D.C. Cir. 1985) (holding that hours "reasonably expended" in preparing a fee petition are compensable). It is a common practice in this jurisdiction to award fees on fees in FOIA cases. *See, e.g., Heard v. District of Columbia*, 2006 U.S. Dist. LEXIS 62912, 2006 WL 2568013, at *19; *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Veteran Affairs*, 1999 WL 33740260, at *2 (D.D.C. Apr. 13, 1999). That counsel spent more time on the fee petition than on the merits is not inherently unreasonable; the fee litigation involved complex legal issues, including entitlement, rates, and multipliers. Accordingly, there is no basis for Defendants' implied assertion that a proportional comparison between merits time and fee petition time is dispositive. Courts instead evaluate whether the time was reasonably expended given the nature of the issues raised.

To be sure, FOIA litigation may be resolved quickly, especially where an agency voluntarily releases records after suit is filed. However, the minimal time required to litigate the merits in such cases does not diminish the Plaintiff's entitlement to fees. Instead, fee litigation can be—and often is—substantially more complex, particularly when a defendant, as here, challenges

21

eligibility, entitlement, and the reasonableness of the fee. Plaintiff's motion for attorneys' fees required extensive work, including: (1) detailed factual and legal analysis of two separate but related FOIA matters; (2) a demonstration of Plaintiff's status as having "substantially prevailed" under 5 U.S.C. § 552(a)(4)(E); (3) application of the *Tax Analysts* four-factor test for entitlement; (4) justification of counsel's billing rates based on prevailing market data; (5) preparation of contemporaneous billing records and supporting declarations; and (6) anticipation and preemption of Defendant's likely objections. Accordingly, Plaintiff's fees are reasonable under the circumstances.

## **CONCLUSION**

Because Plaintiff is both eligible for and entitled to attorneys' fees and costs, and because Plaintiff's requested amount is reasonable under the circumstances, Plaintiff respectfully requests that the Court grant this Motion for Attorneys' Fees and Costs and award Plaintiff a total of $22,538.75 in Civil Action No. 1:23-cv-03674-RBW and $21,705.80 in Civil Action No. 1:24-cv-00813-RDM.

Dated: September 11, 2025.                    Respectfully submitted,

                                              SIRI & GLIMSTAD LLP

                                              *s/ R. Scott Pietrowski*
                                              Elizabeth A. Brehm, DC Bar No. NY 0532
                                              R. Scott Pietrowski, DC Bar No. MS0012
                                              745 Fifth Avenue
                                              Suite 500
                                              New York, NY 10151
                                              Tel: (888) 747-4529
                                              ebrehm@sirillp.com
                                              spietrowski@sirillp.com

22